**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 13 CR 771 |
| v. | ) | |
| | ) | |
| CARL PALLADINETTI, | ) | Judge Virginia M. Kendall |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On September 26, 2013, Defendant Carl Palladinetti was charged with seven counts of bank fraud in violation of 18 U.S.C. § 1344 (Counts I-VII) and five counts of making false statements in violation of 18 U.S.C. §§ 1014, 2 (Counts VIII, X, XI, XIII, XV). Specifically, Palladinetti and his codefendants were charged with operating a real estate scheme in which they worked with individuals to fraudulently obtain mortgages resulting in at least seven fraudulent mortgage loans totaling at least $1.5 million. (Dkt. 2 ¶ 3.) Palladinetti, the attorney for the alleged enterprise, was accused of making false representations to lenders by manufacturing loan qualifications for recruited buyers and then receiving compensation for successful closings under the scheme. (*Id.* at ¶ 4-6, 14.) Additionally, Count I of the Indictment charged him with utilizing the scheme to facilitate his wife's purchase of a property in Chicago. (*Id.*)

Prior to trial, Gary Ravitz, Palladinetti's appointed lawyer, negotiated with the government to limit the trial to a narrow issue as to Count I—whether the lender at issue was a financial institution insured by the FDIC. Palladinetti stipulated to the remaining elements of Count I and the government did not proceed on any of the other counts against him. (Dkt. 171.) Following a stipulated bench trial, the Court found Palladinetti guilty of Count I. (Dkt. 172 at 2-

3.) (*Id.*) Palladinetti then timely filed a motion for a new trial pursuant Fed. R. Crim. P. 33, arguing that Ravitz was ineffective due to: (1) their difficult relationship; (2) Ravitz's refusal to withdraw from representing Palladinetti; (3) Ravitz coercing Palladinetti into a stipulation prior to trial; (4) Ravitz's failure to explain the significance of signing the stipulation. Further, Palladinetti argues that he is entitled to a new trial because the Court failed to conduct an inquiry into whether Palladinetti knowingly and voluntarily signed the stipulation. For the reasons set forth below, Palladinetti's Motion [181] is denied.

## BACKGROUND

Following the filing of Palladinetti's motion, the Court held an evidentiary hearing to examine issues related to Ravitz's representation of Paladinetti. *United States v. Berg*, 714 F.3d 490, 500–01 (7th Cir. 2013) (noting that district courts have the discretion to hold evidentiary hearings even though the Sixth Amendment does not require it). The sworn witness testimony and documentary evidence produced in the hearing is summarized as follows:[1]

### I. Ravitz's Background & Appointment

Palladinetti is an attorney and has practiced real estate law for over twenty years. (*Id.* at 8.) Ravitz was appointed to represent Palladinetti in November 2014 after Palladinetti's original attorney moved to withdraw citing irreconcilable differences with Palladinetti. (*Id.* at 9, 100; Dkts. 76, 88.) Gary Ravitz has been an attorney for forty years. (Tr. at 98.) He has been licensed to practice in the State of Illinois, and admitted to the Northern District of Illinois, the Sixth and Seventh Circuits, and the United States Supreme Court. (*Id.*) After completing a judicial clerkship, Ravitz began his career in criminal defense work. (*Id. at* 98-99.) He has represented criminal clients at trial in a wide range of areas, including drug offenses, fraud, and

---

[1] Citations to the transcript from the evidentiary hearing, which took place on June 22-23, 2016, are indicated by "Tr." followed by the page numbers and can also be found at Dkt. 213.

criminal civil rights violations.  (*Id.* at 99-100.)  In particular, Ravitz has specialized in homicide cases and cases in which the defendant faces the death penalty, and he was certified by the Illinois Supreme Court as an expert in capital litigation.  (*Id.* at 99.)

After Ravitz was appointed to represent Palladineti, the Government provided him with a large amount of discovery material which he carefully reviewed.  (Tr. at 100-101.)  Ravitz did not share the entire file, which primarily consisted of Palladinetti's own files, with Palladinetti, believing that Palladinetti had already received the discovery file from his previous attorney.  (*Id.* at 100-102.)  Nevertheless, Ravitz provided Palladinetti with relevant documents in anticipation of the two trial dates and reviewed several key documents with Palladinetti, including the real estate, title insurance, and bank files, along with witness statements.  (*Id.* at 101-103.)  In fact, Ravitz discussed the issues of the case and shared his view of the evidence with Palladinetti over 40 times in the months leading up to trial in spite of difficulties Ravitz experienced in getting Palladinetti to cooperate with him.  (*Id.* at 103-104.)

From the beginning of his appointment, Ravitz believed that the government had a strong case against Palladinetti, in part because Palladinetti was the attorney for the real estate seller, worked with the loan originator to prepare the contracts that effectuated the fraud and because one of the sham real estate purchasers was Palladinetti's wife and Palladinetti acted as the closing attorney for that transaction.  (*Id.* at 104; Dkt. 172 at 2-3.)  As early as January 16, 2015, Ravitz submitted a letter to Palladinetti outlining his major concerns with the case and encouraging Palladinetti to either plead guilty or to cooperate with the government against his codefendant.  (Tr. at 104-105; Dkt. 223 at 9-10.)  Ravitz also reviewed a draft plea agreement with Palladinetti, including the relevant sentencing guidelines calculations.  (Tr. at 104-106.)

Ravitz prepared for two different trial dates; trial was originally set for July 2015, but

Palladinetti asked Ravitz to seek a continuance, so the trial was rescheduled for March 7, 2016. (*Id.* at 101.) In addition to Ravitz's work reviewing the record, Ravitz frequently communicated with Palladinetti to update him on the status of his research, the evolution of his trial strategy, and the progress of his communications with the Government. In particular, in the two weeks leading up to trial, Ravitz communicated with Palladinetti nearly every day and conferred with him at least 13 times the month before trial. (*Id.* at 161-163; Dkt. 223 at 43-44, 60; Dkt. 223-1 at 6, 41, 44-45.) Ravitz was also diligent about forwarding correspondence from the Government and other relevant third parties to Palladinetti for his review and feedback. (Dkt. 223-1 at 8, 20, 26-28, 37-39, 40, 44-45, 48, 50, 53, 57, 60.) Palladinetti frequently disagreed with Ravtiz's advice and strategy, and while Ravitz ultimately accommodated Palladinetti's desire not to plead guilty, Ravitz explained his perspective to Palladinetti whenever new information arose. (Tr. at 166; Dkt. 223 at 16-18, 20-21, 24-35, 39-40, 41-42, 57.)

## II. Decision to Proceed with Bench Trial

In anticipation of trial scheduled for March 1, 2016, Ravitz asked Palladinetti to attend a reverse proffer with the government on February 5, 2016. (Tr. at 9, 36-38.) The reverse proffer, which was essentially the prosecutor laying out the evidence that the government would present against his client, reinforced Ravitz's view that the government's case was strong against Palladinetti, particularly with respect to Count I, which involved Palladinetti's wife's involvement in the fraudulent scheme. (*Id.* at 9, 110-111.) After the reverse proffer, Ravitz met with Palladinetti, at which time Ravitz again encouraged Palladinetti to plead guilty. (*Id.* at 11.) According to Ravitz, Palladinetti recognized the strength of the government's case at that meeting when he informed Ravitz that "they got me; I can't beat this case." (*Id.* at 110-111, 191, 198.) Ravitz testified that following the reverse proffer, Palladinetti also did not feel confident

about his chances at a jury trial, but did wish to have a bench trial on the narrow issue of whether

the lender was insured by the FDIC at the time of the fraud, a potential defense he had been

focused on prior to Ravitz's appointment.[2] (*Id.* at 12, 33, 106-109, 111, 124.) Palladinetti

testified that it was Ravitz's idea to hold the bench trial. (*Id.* at 11-12.) Consistent with Ravitz's

testimony that Palladinetti recognized the strength of the government's case, in a memo to

Palladinetti on February 6, 2016, the day after the reverse proffer, Ravitz noted that he "agree[d]

the evidence against you of the charged scheme to defraud is overwhelming," discussed

shortcomings in the FDIC defense, and again urged Palladinetti to plead guilty. (Dkt. 223 at 21.)

Palladinetti, however, continued to advocate for a trial on the FDIC issue. In the days following

the reverse proffer, Ravitz sent Palladinetti additional correspondence highlighting weaknesses

in the FDIC defense. (*Id.* at 24-42.) After not hearing back from Palladinetti, on February 18,

2016, Ravitz wrote him, indicated that he was "reject[ing Ravitz's] advice that we immediately

settle the case by way of a guilty plea as opposed to going forward with the scheduled bench trial

on the issue of whether the 'victim' banks were FDIC insured." (Dkt 223 at 44.) While

discussing the prospects of a bench trial, Ravitz testified that he explained to Palladinetti that the

government would likely only agree to a bench trial if he stipulated to the elements of the fraud,

with the exception of the FDIC issue. (Tr. at 118.) In the days following the reverse proffer,

Ravitz informed the Government that Palladinetti wished to proceed with a bench trial as to

Count I and began discussing stipulations. (*Id.* at 44-45, 109, 111, 109, 120, 124, 159-161, 198-

99.) On February 8, 2016, in open court, the parties indicated that they would proceed via bench

---

[2] To establish bank fraud under 18 U.S.C. § 1344(1), "the government must prove: '(1) there was a scheme to defraud a financial institution; (2) the defendant knowingly executed or attempted to execute the scheme; (3) the defendant acted with the intent to defraud; and (4) the deposits of the financial institution were *insured by the FDIC at the time of the charged offense*.'" *United States v. Ajayi*, 808 F.3d 1113, 1119 (7th Cir. 2015) (quoting *United States v. Parker*, 716 F.3d 999, 1008 (7th Cir.2013)) (emphasis added). Palladinetti believed that the lending entity was not insured by the FDIC at the time of the offense. (Trial Tr. at 12.)

trial.  (*Id.* at 46.)  Palladinetti did not object to the bench trial at that hearing.  (*Id.*)

### III.    The Stipulations

Parallel to their discussions about proceeding with a limited bench trial, Palladinetti and Ravitz had discussions regarding the scope and structure of Palladinetti's stipulations.   On February 18, 2016, Ravitz raised the issue of the stipulation with Palladinetti and the next day, Ravitz sent an email to Palladinetti with a proposed stipulation which was substantively similar to the final stipulation.[3]  (*Id.* at 115; Dkt. 223 at 44, 58.)   (Ravitz wrote that "I think the following proposed stipulation accomplishes *your* purposes. Carl Palladinetti admits the allegations contained in Count 1 of the indictment, except for the following allegations . . . that Washington Mutual Bank funded the mortgage loan described therein.") (emphasis added.)   In response, Palladinetti requested that Ravitz wait to communicate with the government until after they had spoken.  (Dkt. 223 at 59.)

Over the course of the next few days, Ravitz emailed Palladinetti several times regarding the stipulation and the viability of his FDIC defense.  (*Id.* at 60, 67.)  According to Ravitz, he and Palladinetti then had a phone conversation where Palladinetti indicated he understood the stipulations and wanted to enter into them to ensure that the government agreed to a bench trial, and if Palladinetti was convicted, the stipulations would allow him to argue at sentencing that he had accepted responsibility for the crime. (Tr. at 116-119.)  On February 23, 2016, Ravitz sent an email to Palladinetti which attached a draft memorandum to the government regarding the proposed stipulation and indicated that Paladinneti would admit to engaging in a scheme to defraud and would only contest the FDIC issue.  (*Id.* at 126-128; Dkt. 223-1 at 18.)  Ravitz then

---

[3] Ravitz's proposed stipulation read, "Carl Palladinetti admits the allegations contained in Count One of the Indictment, except for the following allegations: ¶1d [that Washington Mutual Bank was a financial institution insured by the FDIC] and the specific allegation in ¶ 17 that Washington Mutual Bank funded the mortgage loan described therein."  (Dkt. 223 at 58-60.)

sent the memorandum to the government. (*Id.*) The following day, Ravitz forwarded an email chain between himself and the government to Palladinetti regarding the draft stipulation. (Dkt. 223-1 at 28-29.) Palladinetti responded to the email, asking about one of the Government's witnesses. (*Id.* at 30.)

On February 26, 2016, the government emailed Ravitz two draft stipulations, which were similar in substance to Ravitz's draft; the government also indicated that Palladinetti could be tried on more than one count. (Tr. at 133-134, 137-138, 219-220; Dkt. 223-1 at 35.) Ravitz testified that he discussed the issue with Palladinetti who wished to be tried on Count I only, a request Ravitz communicated to the government. (Tr. at 134-135; Dkt. 223-1 at 41.) Later that day, Ravitz forwarded the government's draft stipulations to Palladinetti which Ravitz asked Palladinetti to review. (Tr. at 138, 222-23; Dkt. 223-1 at 37-38.) Ravitz testified that he and Palladinetti then discussed the draft stipulations. (Tr. at 138) Thereafter, Ravitz informed the government by email that Palladinetti agreed with the stipulations if the trial were limited to Count I and then forwarded this email to Palladinetti and invited him to ask any questions he had about the stipulations. (Tr. at 138-139; Dkt. 223-1 at 41.) The government agreed to proceed only as to Count I and produced a final draft of the stipulations on February 29, 2016, the day before trial. (Tr. at 21, 138, 140-141, 214-217; Dkt. 223-1 at 43.) Ravitz testified that he subsequently spoke with Palladinetti about a number of items related to the bench trial, including the stipulations. (Tr. at 141-144.) Ravitz also discussed the stipulations briefly with Palladinetti at the courthouse before the beginning of trial, where Palladinetti had an opportunity to review the finalized versions. (*Id.* at 213.) Then, prior to the start of trial, Palladinetti was provided the stipulations to sign, made a small change to Stipulation One, initialed the change, and then

signed the stipulations. [4]  (Tr. at 58-60, 173-174, 201, 215-216, 173-174, 201, 215; Dkt. 172.)

Despite the documentary record indicating that Ravitz provided multiple opportunities to Palladinetti to discuss the stipulations, Palladinetti claims that Ravitz never reviewed the stipulations with him and Ravitz failed to explain their significance, in that if he lost the bench trial regarding the FDIC issue, he would be found guilty on Count I.  (Tr. at 18-24.)   Palladinetti also claims that he felt coerced into signing the stipulations and that Ravitz never explained what the government was required to prove or what defenses were available to him. (*Id.* at 39-40.)

## IV.    Waiver of Jury Trial

Because the parties agreed to a bench trial, Palladinetti was required to formally waive his right to a jury trial.  On February 29, 2016, Ravitz provided a jury waiver to Palladinetti, which he signed on the day of trial after reviewing it with Ravitz (*Id.* at 55, 174-175; Dkt. 223-1 at 57.)  Before accepting the waiver, the Court conducted a colloquy of Palladinetti.  (Tr. at 55-56.)   When questioned about this exchange during the evidentiary hearing, the Government asked Palladinetti:

> Government: You were advised of your rights in the document and by Judge Kendall, correct?
> Palladinetti:   Yes.
> Government: And you signed and dated that document on Page 2?
> Palladinetti:   Yes, I did.
> Government: And I signed it, Ms. Csicsila signed it and Mr. Ravitz signed it?
> Palladinetti:   That is correct.
> Government: And after signing that waiver, Mr. Palladinetti, or during -- let me just say this: During her Honor's questioning of you of that waiver, did you ever say, I don't want to do this?

[4] The final stipulation, signed by all parties on March 1, 2016, contains four pages: a cover page indicating that the parties "stipulate as follows;" Stipulation No. 1, which indicated that Palladinetti knowingly worked with his codefendants to effectuate a real estate development scheme resulting in the fraudulent purchase of at least thirty buildings in and around the Chicago area, including one purchase made fraudulently by Palladinetti's wife; and Stipulation No. 2, which indicated that four of the Government's exhibits are true and accurate copies created in the ordinary course of business.  An edit to Stipulation No. 1 was initialed by all parties on page two, but the only signatures are inscribed on page four.  (Dkt. 172.)

Palladinetti:   I didn't --
Government: "Yes" or "No," Mr. Palladinetti?
Palladinetti:   No.
Government: Did you ever say, Judge, there's a problem with Mr. Ravitz; I don't like the way this is going down; I'm not waiving my right to a jury trial? Did you ever say those words to her?
Palladinetti:   No.
Government: Anything to that effect?
Palladinetti:   No.

(Tr. at 56.)

## V. Ravitz's Decision to Withdraw

Both Palladinetti and Ravitz indicated that there was never any discussion about Ravitz withdrawing until the eve of trial. But there are two different versions as to how the topic arose. Palladinetti states that he asked Ravitz to withdraw on the morning of trial, but Ravitz refused, only bringing the issue to the Court after the bench trial concluded and the Court found him guilty. (*Id.* at 14, 17.) Palladinetti's version, however, is belied by the record. Although there is no doubt that in the days leading up the trial, Palladinetti and Ravitz disagreed on trial tactics and strategy, there is no evidence that Palladinetti ever asked Ravitz to resign. In fact, the evening before the trial, Palladinetti confirmed in an email to Ravitz that he did not want Ravitz to withdraw, but merely wanted him to fight harder for his interests. (*Id.* at 158-59; Dkt. 223-1 at 59.) Ravitz responded the morning of the trial, with an email saying that if Palladinetti had any lingering concerns, the time to raise them with the Judge was before the trial began in earnest and entreated Palladinetti to let either Ravitz or the Judge know if he had changed his mind regarding representation. (Tr. at 158-59; Dkt. 223-1 at 62.) Palladinetti did not raise the issue with the Court prior to trial, even when he had an opportunity to do so.

After trial, however, Palladinetti informed Ravitz that he "could have done a better job" and that Palladinetti "should have done it himself." (Tr. at 177-78.) Ravitz testified that he

knew at that point that the attorney-client relationship was irrevocably broken and that he would likely be accused of ineffective assistance of counsel. (*Id.* at 178.) According to Ravitz, this is the first instance in which Palladinetti affirmed that he wanted a new attorney, so Ravitz raised the issue with the Court, the Court conducted a colloquy with Palladinetti after the trial, and Ravitz withdrew as Palladinetti's counsel. (*Id.* at 178, 207.)

## VI. Attorney-Client Relationship

Palladinetti and Ravitz both admit that their relationship was rocky. Palladinetti characterized it as "acrimonious, spiteful, venomous, and extremely difficult," (Dkt. 181 ¶ 3) while Ravitz characterizes it as "stormy." (Tr. at 202.) Both Palladinetti and one of his coworkers, Juan Cano, testified to heated telephone conversations between Palladinetti and Ravitz. (Tr. at 21-22, 75-83.) Palladinetti also testified as to a series of "violent" emails that he exchanged with Ravitz between February 25th and March 1, 2016, although any such emails were not introduced as exhibits at the hearing. (Tr. at 43-44.) Additionally, Ravitz testified that he may have been harsh with Palladinetti, including telling him to "be a man," calling him a "thug" and a "bully," and hanging up on him. (*Id.* at 203-205.) Yet, despite the nature of the relationship, Ravitz testified that he was still able to zealously represent Palladinetti, and that he was still unwilling to withdraw without Palladinetti expressly asking him to do so.[5] (*Id.* at 205-206.)

<u>**LEGAL STANDARD**</u>

Rule 33 motions are generally disfavored and courts should only grant them in "the most 'extreme cases.'" *See United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998) (quoting *United States V. Morales*, 902 F.2d 604, 606 (7th Cir. 1990)); *see also United States v. Swan*,

---

[5] Generally speaking, a review of the written correspondence suggests that, despite the "stormy relationship," Ravitz maintained professional decorum in his communications with Palladinetti and did his best to involve Palladinetti in the case.

486 F.3d 260, 266 (7th Cir. 2007) (quoting *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989)) ("The court should grant a motion for a new trial only if the evidence 'preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.'"). A court may vacate a judgment and grant a new trial upon the defendant's motion "if the interest of justice so requires." *See* Fed. R. Crim. P. 33(a); *see also Berg*, 714 F.3d at 500. That means "a defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect" on the verdict. *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006); *see also United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989) (evaluating the merits of Defendant's motion by determining whether "the substantial rights of the defendant have been jeopardized by errors or omissions during trial").

## DISCUSSION

Palladinetti moves to vacate the judgment against him and seeks a new trial on several grounds, most of which are based on his supposition that the ineffective assistance of trial counsel prejudiced him such that justice requires a new trial. Specifically, Palladinetti argues that: (1) he and Ravitz had a difficult relationship, which resulted in Ravitz's incompetent representation; (2) Ravitz refused to withdraw his representation and indicated that Palladinetti would be unable to retain new counsel; (3) Palladinetti maintained his innocence and did not want a stipulated bench trial, but was coerced into signing Stipulation No. 1; (4) the significance of signing Stipulation No. 1 was never explained to him; and (5) the Court conducted no inquiry into whether Palladinetti knowingly and voluntarily signed the stipulation. (Dkt. 181 at 1-4; Dkt. 181-1.) The government contends that many of Palladinetti's allegations are false, but, to the extent they are true, Ravitz provided competent assistance and Palladinetti failed to show he was prejudiced by any of Ravitz's alleged shortcomings. (Dkt. 231 at 13, 23-29.)

A defendant's Sixth Amendment right to counsel is violated when (1) counsel's performance was deficient, meaning "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (2) counsel's deficient performance prejudiced the defendant such that, but for the deficiency, there is a reasonable probability that the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). As to the first element, the "[C]ourt must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and presume that it is a "sound trial strategy." *Id.* at 689 (counsel maintains "wide latitude" in making tactical decisions); *see also, Vinyard v. United States*, 804 F.3d 1218, 1225 (7th Cir. 2015) ("A court's scrutiny of an attorney's performance is 'highly deferential' to eliminate as much as possible the distorting effects of hindsight…."). A defendant must identify specific acts or omissions by counsel that constitute ineffective assistance, and the Court then considers whether they are outside the wide range of professionally competent assistance based on all the facts of the case. *See Berkey v. United States*, 318 F.3d 768, 772 (7th Cir. 2003) (citing *Menzer v. United States*, 200 F.3d 1000, 1003 (7th Cir. 2000)). The second *Strickland* element requires the defendant to prove that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Vinyard*, 804 F.3d at 1227; *see also Blake v. United States*, 723 F.3d 870, 879 (7th Cir. 2013) (adding that the proceedings must have been "fundamentally unfair or unreliable"). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694 (holding that defendants must show more than "that the errors had some conceivable effect on the outcome of the proceeding"). As such, unsupported, "conclusory

statement[s]" are insufficient to show prejudice. *United States v. Farr*, 297 F.3d 651, 658 (7th Cir. 2002).

## I. Competent Assistance

### A. "Stormy" Relationship

Palladinetti argues that his acrimonious relationship with Ravitz prevented Ravitz from adequately representing him. (Dkt. 181 ¶¶ 3-4.) The Sixth Amendment, however, only protects a criminal defendant's right to an effective advocate, not a preferred advocate. *Wheat v. United States*, 486 U.S. 153, 159 (1988); *see also*, *United States v. Golden*, 102 F.3d 936, 942 (7th Cir. 1996) (citing *United States v. Turk,* 870 F.2d 1304, 1307–08 (7th Cir. 1989)) ("The sixth amendment requires the court to satisfy itself that the defendant is adequately represented, not to speculate on the complex emotional relationship of a client and her lawyer."). Therefore, even "[t]he irreconcilable differences between [an attorney and his client] do not support a finding of ineffective assistance of counsel." *United States v. Mutuc*, 349 F.3d 930, 934 (7th Cir. 2003). Palladinetti notes specifically that he felt intimidated, coerced, and pressured by Ravitz. The record simply does not support this allegation. The record reflects numerous instances in which Ravitz informed Palladinetti of his options, sought his advice, and solicited questions and this was frequently, if not always, documented in a written communication (Tr. at 161-63, 166; Dkt. 223 at 16-18, 20-21, 24-35, 39-40, 41-42, 43-44, 57, 60; Dkt. 223-1 at 6, 8, 20, 26-28, 37-39, 40, 41, 44-45, 48, 50, 53, 57, 60.) Furthermore, Ravitz testified that the nature of his relationship with Palladinetti did not affect his ability to zealously advocate for him, Ravitz complied with Palladinetti's wish to litigate the FDIC issue, and the record corroborates Ravitz's testimony that he was working hard to reach a desirable outcome for Palladinetti. Furthermore, to the extent the relationship was difficult, Palladinetti must accept most of the responsibility. A review of the

record indicates that Palladinetti often failed to respond to Ravitz's e-mails and was confrontational during others. Indeed, his previous counsel withdrew after the attorney-client relationship became irretrievably broken. The record of their written communications strongly corroborates Ravitz's testimony that although he and his client had differences, Ravitz more than adequately notified his client of his choices, explained the risks and benefits of those choices, worked hard to professionally represent a client who often failed to communicate with his attorney, failed to respond when asked to do so, and sought unreasonable and often fruitless requests from his counsel. The record shoes that Ravitz performed his duties as counsel and nothing about his representation can be viewed as ineffective. *Strickland*, 466, U.S. 688 (overarching duties include advocating for the defendant's cause, "consult[ing] with the defendant on important decisions [, and keeping] the defendant informed of important developments in the course of the prosecution). Remarkably, Palladinetti is an attorney himself; and therefore, he was able to converse with Ravitz at a level that most clients are not able to. Palladinetti's testimony at the hearing was unbelievable in light of his own legal training and his own awareness of his options and decisions based on that training, Palladinetti is not an uneducated individual overwhelmed by his attorney; instead, he is an educated lawyer who recognizes that the only legal way out of his conviction at this point is to blame his lawyer since he knowingly and voluntarily chose the path he took to the bench trial and now is attempting to avoid the consequences of his choice. Ravitz has no motivation to lie to the Court about his interactions with his client; but Palladinetti has every reason to attempt to alter the truth of his interactions. Ravitz's statements on the witness stand were corroborated by the careful and detailed written communications that he saved and therefore support his truthful version of the interaction.

### B. Refusal to Withdraw

Palladinetti also claims that Ravitz refused to withdraw as counsel and falsely indicated that Palladinetti would be unable to retain new counsel. (Dkt. 181 at ¶¶ 5-6.) Ravitz's sworn testimony, which the Court found to be credible, and supporting documentary evidence, indicates that this claim is "manifestly false." (Tr. at 180.) Ravitz testified that he was never asked to withdraw before trial. (*Id.* at 181.) Documents produced in this case support Ravitz's testimony, indeed, the night before trial Palladinetti explicitly wrote Ravitz that he did not want him to withdraw and Ravitz's email on the morning of trial gave Palladinetti an opportunity to raise the issue with the Court or him before trial started. (Dkt. 223-1 at 59.) Palladinetti, an attorney himself, never informed the Court that there was in irreconcilable break down in the attorney-client relationship and does not appear to have responded to Ravitz's email regarding the possibility of withdrawal.

### C. Stipulated Bench Trial

Palladinetti next claims that he never wanted to pursue a stipulated bench trial and that he was coerced into signing Stipulation No. 1. (Dkt. 181 at ¶¶ 7-9.) This assertion is also belied by the record. As discussed thoroughly above, there are many documents in the record indicating that Palladinetti, not Ravitz, was the one who wished to proceed to trial on the FDIC issue. Palladinetti researched the FDIC issue before Ravitz's appointment and repeatedly referenced the issue in communication with Ravitz. In his correspondence with Palladinetti, Ravitz repeatedly attempted to dissuade Palladinetti from proceeding on a trial on the issue. Furthermore, Palladinetti, a lawyer himself, stood before the Court and unequivocally waived his right to a jury trial. (Dkt. 173.)

Even if it were Ravitz's idea to proceed via a stipulated bench trial, this Court could not find that decision to be constitutionally ineffective. Because "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable," the Court's scrutiny must be "highly deferential." *Strickland*, 466 U.S. at 689. This Court is obligated to "start with the 'presumption that counsel's conduct falls within the wide range of reasonable professional assistance' . . . [b]ecause reasonable attorneys may have a great deal of disagreement about appropriate strategy or tactics." *Julian v. Bartley*, 495 F.3d 487, 495 (7th Cir. 2007) (internal citation omitted). In particular, the Seventh Circuit has noted that "the decision to opt for a bench trial rather than a jury trial can be a reasonable choice of strategy." *Burns v. Hompe*, 339 F. App'x 624, 629 (7th Cir. 2009) (citing *Milone v. Camp,* 22 F.3d 693, 705 (7th Cir. 1994) ("*Strickland* requires great judicial deference to strategic decisions such as whether to waive trial by jury."); *see also, e.g., Kincaid v. United States*, No. 10-3010, 2011 WL 1988552, at *4 (C.D. Ill. May 23, 2011) (denying Defendant's habeas petition on grounds of ineffective assistance of counsel when the record did not support the allegation that trial counsel pressured Petitioner into signing a Waiver of Jury Trial and Stipulations for Bench Trial). In the similar context of guilty pleas, a criminal defense attorney's duties are to inform the client of the proffered plea agreement and to involve the client in the decision-making process; adherence to these duties undermines claims for ineffective assistance. *Golden*, 102 F.3d at 943 (citing *Johnson v. Duckworth*, 793 F.2d 898, 902 (7th Cir.), *cert. denied*, 479 U.S. 937 (1986)). Even when assuming that it was Ravitz's strategy, when applying the required deference, the decision to proceed with a stipulated bench trial did not fall outside the wide range of reasonable professional assistance.

### D. Significance of Stipulation No. 1

Palladinetti further asserts that Ravitz never sufficiently explained the significance of the relevant stipulation before he signed it. (Dkt. 181 at ¶¶ 10, 13.) The record again completely contradicts Palladinetti on this assertion. Although Ravitz admits that he did not read the stipulation to Palladinetti, Ravitz did just about everything else to ensure that Palladinetti reviewed the stipulation and was engaged in the drafting process. As set forth above, Ravitz raised the issue of the stipulation with Palladinetti as early as February 18, 2016, approximately two weeks before trial. Leading up to trial, Ravitz repeatedly sent Palladinetti drafts of the stipulation, asked him to review it, and asked for his input.[6] (*Id.* at 115; Dkt. 223 at 58.) Instead of engaging in the drafting of the stipulation and asking questions to clarify the ramifications of the stipulation, Palladinetti testified that he did not review the draft stipulations and only looked at the final version on the morning of trial. (Tr. at 22-23.) Palladinetti was a sophisticated client and a licensed attorney. Even if the Court were to believe that he failed to review the stipulation prior to trial, that failure cannot be attributed to Ravitz.

Ravitz also testified that he believed Palladinetti understood the nature and consequences of both the stipulation and the waiver of jury trial based on his communications with Palladinetti along with his client's independent legal training. (Tr. at 175-177.) As noted above, this assumption is supported by the numerous communications that Ravitz initiated with Palladinetti, soliciting feedback and questions regarding the stipulation and bench trial, to which he received responses. (Tr. at 161-166; Dkt. 223 at 16-18, 20-21, 24-35, 39-40, 41-42, 43-44, 57, 60; Dkt. 223-1 at 6, 8, 20, 26-28, 37-39, 40, 41, 44-45, 48, 50, 53, 57, 60.) (*See, e.g.,* Aug. 21, 2015:

---

[6] Documentary evidence suggests that Palladinetti received Ravitz's first draft of the stipulation on February 19, 2016—ten days before trial; he received the Government's first proposed draft on February 26, 2016—three days before trial; and he reviewed the Government's final draft, which reflected only minor changes, on the morning of the trial. (Dkt. 223 at 58; Dkt. 223-1 at 37; Tr. at 21-22, 214-216.)

"Please refer to the attached memo [outlining numerous outstanding items for Palladinetti to complete]. It's ok to address the listed a few at a time. If you start today, they will get done." Feb. 6, 2016: "Please give careful consideration to the attached [memo outlining the case against Palladinetti as described in the reverse proffer and offering suggestions on trial strategy]." Feb. 18, 2016: "I want to give you a chance to weigh in, so I request that you make yourself available at 9:30am on Friday morning to discuss the case by telephone." Feb. 19, 2016: "Please let me know whether you agree to the proposed stipulation . . . [I]f you think we need to further about the matter then you should call me or send an email by 5 p.m. today." Feb. 20, 2016: "Please make your decisions about these issues [witnesses and stipulations] and notify me without delay.")

An attorney's duty is to "consult with the defendant and obtain consent to the recommended course of action" in making decisions regarding "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *See Florida v. Nixon*, 543 U.S. 175, 187 (2004) (applying these duties in a capital case); *see also* Model Rules of Prof'l Conduct R. 1.16(b) (allowing an attorney to withdraw from a case if "the client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services"). Palladinetti offers no evidence to contradict Ravitz's efforts to engage him in the decision-making process, other than his testimony that he did not wish to plead guilty. (Tr. at 11.) Again, indulging a strong presumption that counsel's conduct was reasonable, when considering Ravitz's level of engagement with Palladinetti, particularly given Palladinetti's independent legal training, Ravitz was not ineffective.

### E. Court Colloquy Regarding Stipulation

Finally, Palladinetti claims that the Court should have conducted a separate inquiry into whether Palladinetti knowingly and voluntarily signed the stipulation. (Dkt. 181 ¶ 11.) However, stipulations are different from guilty pleas and jury waivers in that there is no requirement under the Federal Rules of Criminal Procedure for a colloquy to ensure that the defendant understands the stipulation. *C.f.* Fed. R. Crim. P. 11, 23; *see also*, *Seymour v. Dobucki*, 998 F.2d 1016 (7th Cir. 1993) (holding that it is only "in cases where the defendant stipulates to factual as well as legal guilt, [that] he waives all of the rights that he would waive by pleading guilty, and must be given the protections of defendants who plead guilty"). Although Palladinetti stipulated to some elements of Count I, he reserved the FDIC issue for trial, and therefore, his stipulation was not tantamount to a guilty plea. *Id.* Additionally, the Court conducted a colloquy of Palladinetti regarding his jury trial waiver (Tr. at 55-56) and also gave each party an opportunity to object to the stipulation before the trial began. (*Id.* at 69-70.) Although Palladinetti conferred with Ravitz before signing the stipulation, and at thirteen other times during the course of the trial, he never asked Ravitz to object to the stipulation or otherwise brought any hesitation to the Court's attention. (*Id.* at 70-73.) Because this Court has no obligation, either under the Federal Rules or based on precedent to conduct such a colloquy, this argument is also without merit. Palladinetti has offered insufficient evidence to show that Ravitz's counsel was unreasonable such that it violated the Sixth Amendment.

## II. Prejudice

Even if the Court were to find that Ravitz's representation violated Palladinetti's constitutional right to counsel, Palladinetti has not shown that any of Ravitz's purported shortcomings prejudiced the outcome of the trial. In determining prejudice, the Court

"consider[s] the totality of the evidence." *Dixon v. Snyder*, 266 F.3d 693, 704 (7th Cir. 2001) (quoting *Strickland*, 466 U.S. at 695). Thus, "a 'mere allegation by the defendant that he would have insisted on going to trial is insufficient'" to show prejudice. *Julian*, 495 F.3d at 499 (quoting *United States v. Fudge*, 325 F.3d 910, 924 (7th Cir.2003)). If Palladinetti "demonstrate[s] that the chances of prejudice were better than negligible," he will succeed. *Id.* at 500. However, he is unable to do so.

First, in at least one instance where the Seventh Circuit has found that a strained attorney-client relationship was so severe as to adversely affect an attorney's representation of his or her client, it still found that the attorney's deficient performance did not satisfy the prejudice prong of the *Strickland* test. *Smith v. Brown*, 764 F.3d 790, 797–98 (7th Cir. 2014). Additionally, the Seventh Circuit has held that counsel's strategy of proceeding via stipulations does not amount to a coerced guilty plea or other violation that would prejudice the defendant. *Seymour*, 998 F.2d at 1016 (holding a defendant's claim that, by convincing him to proceed with a stipulated bench trial, his attorney effectively caused him to "involuntarily and unintelligently to plead guilty" was frivolous because advising the defendant to "stipulate to particular facts and testimony" was a sound strategy given the defendant's plea of not guilty and the state's strong case against him). Furthermore, proceeding on a stipulated bench trial and agreeing to stipulation ultimately afforded Palladinetti the opportunity to argue for a two-point reduction in his sentencing calculation for acceptance of responsibility, and resulted in the government not pursuing the other counts against him. (Tr. at 216-220.) Given the substantial evidence the government had against Palladinetti, and Palladinetti's own fears about a jury potentially judging him more harshly because he was an attorney, it is probable that the outcome Ravitz negotiated was better than Palladinetti would have received had he proceeded to a trial as to all elements of the crime.

Furthermore, Palladinetti has offered no evidence that "there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different, such that the proceedings were fundamentally unfair or unreliable." *Blake v. United States*, 723 F.3d 870, 879 (7th Cir. 2013). He makes no allegations of prejudice beyond claiming that the relevant stipulation amounted to an improper guilty plea. (Dkt. 181 ¶ 8; Dkt 232 at 6.) Meanwhile, the government presented its case at the reverse proffer and provided evidence that Palladinetti himself recognized as overwhelming. Therefore there is no reason to overturn the verdict and grant a new trial pursuant to Rule 33. *See, e.g., United States v. Villegas*, No. 07 CR 260, 2009 WL 1657072, at *4 (N.D. Ill. June 11, 2009) (in which Defendant raised "ten separate grounds in support of his motion for a new trial, all of which fail[ed] to establish that it would contravene the interests of justice to let the verdict stand").

## CONCLUSION

For the reasons stated herein, Carl Palladinetti's motion for a new trial is denied.


Hon. Virginia M. Kendall
United States District Judge

Date: August 1, 2017